UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------
                                              )
AMTRUST FINANCIAL SERVICES, INC.,             )
                                              )
                              Plaintiff,       )          Case No. ___ Civ. ___ (  )
                                              )
              v.                               )          COMPLAINT
                                              )
ANTONIO SOMMA and MARCO LACCHINI,   )          JURY TRIAL DEMANDED
                                              )
                              Defendants.      )
                                              )
------------------------------------------------------------

Plaintiff AmTrust Financial Services, Inc. ("AmTrust"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, for its Complaint herein against Antonio Somma and Marco Lacchini alleges as follows:

## NATURE OF THE ACTION

1.     This action arises out of a scheme perpetrated by Defendants to defraud AmTrust out of not less than hundreds of millions of dollars by inducing it and one of its wholly owned subsidiaries to participate in arbitrations that Defendants had rigged through bribery.

2.     After enlisting AmTrust to enter a commercial arrangement to produce and underwrite medical malpractice insurance business in the Italian market, with AmTrust as the insurer and companies controlled by Somma as the producer, Defendant Somma betrayed AmTrust by embarking upon the process to start a competing business and stealing AmTrust's confidential and proprietary information.  Subsequently, Somma resorted to theft and sought to steal more than €90,000,000.00 of insurance premiums and premium tax from AmTrust.  When AmTrust thwarted that scheme, Somma concocted an even bigger one.

3.      In October 2014, Somma filed an arbitration against AmTrust and one of its subsidiaries, AmTrust Europe Limited ("ATEL"), and a separate arbitration against ATEL alone. In each arbitration, both of which are pending in Milan, Italy, Somma asserted claims arising from the termination of the parties' business relationship and demanded damages exceeding €1,000,000,000–an absurd and fantastical amount of money that bears no relation to any underlying reality.  Somma then bribed Defendant Lacchini, the president of the arbitrations and his co-conspirator, to direct the arbitrations in his favor by promising to pay him ten percent of the amounts recovered from AmTrust and ATEL through the arbitrations.

4.      Of course, Somma failed to disclose the bribery to AmTrust (or to ATEL). Rather, he and Lacchini schemed to mislead AmTrust into paying an enormous settlement by causing the arbitration panels to issue procedural and other rulings that no reasonable tribunal would issue in the context of the dispute.  The procedural orders were written in such a way so that they would be seen as unfavorable to AmTrust.  Somma also brought pressure by directing misleading communications about the arbitrations, predicting a huge, enterprise-threatening loss for AmTrust, to analysts that covered the company.  And, the trump card was that, in the event AmTrust refused to settle for an enormous amount, in excess of hundreds of millions of dollars, Lacchini would provide Somma arbitration decisions containing awards of similar or larger amounts, despite the lack of merit to Somma's claims.

5.      This scheme, unbelievable though it seems, was documented on tape by investigators hired by AmTrust, who recorded both Somma and Lacchini essentially admitting to corrupting the arbitrations.  In addition, around February 2016, a consultant to the AmTrust group was advised by two insurance professionals close to Somma that Somma had stated to

them that he was certain of "the positive outcome of arbitration proceedings" because of his

"direct relationship" with the president of the arbitration panels, Defendant Lacchini.

6.      AmTrust has petitioned an Italian court to remove Lacchini from both

arbitration panels and the arbitrations have since been suspended.  AmTrust, however, has

already expended and will expend substantial sums participating in what were sham arbitrations

and has also suffered reputational harm as a consequence of Defendants' activities.

7.      AmTrust brings this action under the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. § 1961, et seq., and state law to recover for its losses.

## PARTIES

8.      Plaintiff AmTrust is a Delaware corporation with its principal place of business in

New York, New York.  AmTrust is a multinational property and casualty insurer specializing in

coverage for small to mid-sized businesses.  AmTrust is publicly traded on the NASDAQ Global

Market under the symbol AFSI.

9.      Defendant Antonio Somma is, on information and belief, an Italian national and a

resident of Naples, Italy.

10.     Defendant Marco Lacchini is, on information and belief, an Italian national and a

resident of Rome, Italy.

## JURISDICTION AND VENUE

11.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, insofar

as the claims asserted herein arise under the laws of the United States; pursuant to 28 U.S.C.

§ 1332(a)(2), insofar as the matter in controversy exceeds the sum or value of $75,000, exclusive

of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state;

3

and pursuant to 28 U.S.C. § 1367(a) insofar as Plaintiff's state law claim is so related to its RICO

claims that it forms part of the same case or controversy.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C.

§ 1965.  There is no alternate or convenient forum in which Plaintiff's civil claims against

Defendants can be entertained.

## FACTUAL ALLEGATIONS

**AmTrust Engages Somma as an Insurance Broker and Agent**

13.     AmTrust Financial Services, Inc., through its subsidiaries, operates as a

multinational property and casualty insurance company.

14.     In or about December 2009, AmTrust commenced underwriting medical

malpractice insurance in Italy through ATEL, its London-based subsidiary.  ATEL used two

Italian insurance brokers for this purpose, one of which was VIRAS, a company with which

Defendant Somma was associated.

15.     In or about June 2010, Somma separated from VIRAS and established Trust Risk

Group, S.p.a. ("TRG"), headquartered in Naples, Italy.  Shortly thereafter, in July 2010, AmTrust

caused ATEL to enter into a Terms of Business Agreement (the "TOBA") with TRG, which

provided for TRG to act as an insurance broker for ATEL on a non-exclusive basis in the Italian

medical malpractice insurance market.

16.     Under the TOBA, TRG collected and remitted premiums on policies underwritten

by ATEL and received a commission on receipt of such premiums.

17.     The relationship between ATEL and TRG proved fruitful and by the end of 2010,

AmTrust, ATEL and TRG were in discussions concerning the formation of an exclusive

relationship with respect to medical malpractice business.

4

18.     During January and February 2011, the CEO of AmTrust, Barry Zyskind, the CEO of ATEL, Max Caviet, and Somma, the CEO of TRG, met in New York and London, and their discussions culminated in a Framework Agreement between AmTrust, ATEL and TRG, dated as of January 27, 2011.

19.     The Framework Agreement (which was amended in January 2012 and June 2014) provided that, going forward, AmTrust and ATEL would have an exclusive relationship with TRG with respect to medical malpractice insurance in the Italian market, such that AmTrust and ATEL would only insure risks in that market that were presented to it through TRG.  The Framework Agreement provided that if ATEL were to open a branch in Italy, ATEL and TRG would enter into an exclusive agency agreement.

20.     As the parties had anticipated, in 2012, ATEL established a branch in Italy. Accordingly, on or about May 13, 2013, ATEL entered into an agency agreement (the "Agency Agreement") with a subsidiary of TRG named Trust Risk Italia SRL ("TRI").  Under the Agency Agreement, TRI acted as an agent of ATEL, with premiums and taxes to be remitted monthly by TRI to the ATEL Italian branch account.  The parties contemplated that new policies issued by ATEL after the execution of the Agency Agreement would be issued pursuant to the Agency Agreement. Policies that had previously been issued by ATEL under the TOBA would run off until their natural expiry, which could take years (as some of the policies covered multi-year periods), and then be renewed under the terms of the Agency Agreement.

21.     The Agency Agreement was terminable upon written notice without cause.

22.     Between the execution of the Framework Agreement in early 2011 and July 2014, Somma traveled to New York City and met with Barry Zyskind and or other AmTrust and ATEL executives concerning business-related issues no less than seven times.  In December 2011,

Somma also attended and presented at AmTrust's annual business planning meeting.  Aside from those meetings, during that same period, Somma was in the United States, traveling aboard an AmTrust corporate plane on not less than 6 occasions, usually along with AmTrust and/or ATEL personnel.

23.     In or around April 2012, Somma moved from Naples, Italy into an apartment owned by TRG located at the Residences at the Setai, 400 Fifth Avenue, New York, New York (the "New York Apartment").  Somma remained in residence at the New York Apartment for approximately four to five months.

24.     Upon information and belief, TRG still owns the New York Apartment.

**The Relationship Falls Apart When Somma Engages in Misconduct**

25.     The parties' relationship began to deteriorate during the summer of 2014, when it became clear to AmTrust that Somma was intending to compete against AmTrust and ATEL and use information misappropriated from ATEL to do so.

26.     Unbeknownst to AmTrust and ATEL, Somma had been preparing to compete against them since late 2013 and had prepared a business plan that envisioned TRG's shareholders transferring all of TRG's existing business to a new brokerage company Somma would form and acquiring a majority stake in an insurance company.  Somma proposed to fund the new venture with commissions owed to TRG during the run-off of the portfolio of policies it had produced for ATEL.

27.     In late 2013, Somma told Paulo Toriani, the office manager of the Milan office of ATEL's Italian claims management company, AmTrust Claims Management ("ACM"), that he was in the process of establishing his own insurance business, including claims management and

underwriting of medical malpractice in Italy. He offered Mr Toriani a role in this new insurance venture, which Mr Toriani declined.

28.     At around the same time, Somma made the same offer to Guglielmo Marino, the office manager of the Naples office of ACM. Mr Marino also declined.

29.     In September 2013, at Somma's request, ATEL hired Attilio Schettino, the fiancé or boyfriend of Somma's daughter, as an analyst in its London office.

30.     Several months later, on or about January 24, 2014, Schettino, unbeknownst to AmTrust and ATEL, downloaded proprietary information, including ATEL policy and claims data, to a personal cloud-based storage account, which enabled Mr. Schettino to share that information with whomever he chose.

31.     In February 2014, Somma requested that ATEL provide TRG with access to ATEL's confidential and proprietary medical malpractice claims database. This request was refused by ATEL.

32.     In July or August 2014, Somma appointed Schettino – who remained an ATEL employee – the sole director of TRG's claims management company, Trust Risk Claims Management S.r.l.

33.     On July 22 or 23, 2014, unaware of his new or impending employment with TRG, ATEL gave Schettino access to ATEL's proprietary and confidential medical malpractice claims database comprising approximately 36,000 claims (the "Database"). Schettino was given access to the Database to facilitate the performance of his duties for ATEL.

34.     On July 27, 2014, Schettino viewed the Database on four occasions.

35.     Two days later, on July 29, 2014, Somma informed the head of ATEL's Italian branch that Schettino would be resigning and stated that he (Somma) had obtained ATEL's medical malpractice claims database.

36.     On or around August 5, 2014, Schettino handed in his notice to ATEL.  His notice period was one month.

37.     On August 21, 2014, Schettino inserted a USB memory stick into his ATEL laptop, in breach of ATEL's IT security policy.

38.     On August 22, 2014, Schettino downloaded the Database to his laptop and inserted a different USB stick into his ATEL laptop, in breach of ATEL's IT security policy.

39.     The Database contained valuable proprietary information relevant to the pricing of underwriting risks, including accurate claims history, development and claims experience. This type of information is precisely the type of information one would want to start a competing business.

40.     The only credible explanation for Schettino's actions is that he was seeking to download ATEL's medical malpractice claims data to take away from its offices in advance of the end of his employment by ATEL.  There was no legitimate reason for him to do this.

41.     On or around 7th August 2014, Somma offered a position in his intended new insurance venture to Pasquale Vanacore, another ACM employee.  Mr Vanacore declined.

42.     By the end of August 2014, ATEL suspected that Schettino might have taken the Database and, upon investigation, Schettino's attempts to download data onto USB sticks were detected by ATEL's IT Security department.  Schettino was asked to leave and was walked from the premises on September 2, 2014.

8

43.    Alarmed by Schettino's apparent misappropriation of confidential information, and concerned that TRG was preparing to begin competing against it, AmTrust sought an explanation from Somma in a series of emails between Mr. Zyskind in New York, Mr. Caviet in London and Somma in Italy.  Failing to receive a satisfactory explanation, Mr. Zyskind emailed Somma on October 5, 2014 advising that AmTrust and ATEL would terminate their relationship with TRG and requesting a meeting to discuss how to effectuate the separation in accordance with the parties' agreements.

44.    Somma struck back within a week.  On October 10, 2014, TRG wrote to ATEL claiming for the first time a bogus entitlement to €96,963,055  of "advance commissions" – *i.e.*, commissions on business that Somma purportedly expected to, but had not yet produced, and on premiums expected but not yet due on existing policies – under the Framework Agreement and the Agency Agreement and advising that TRG and TRI were withholding in excess of €50,000,000 in premiums from ATEL as a purported offset.  On information and belief, Somma seized these funds because he understood that TRG's and TRI's relationship with AmTrust and ATEL was ending and he needed the funds to provide liquidity for his new insurance venture.

45.    AmTrust and ATEL promptly and unequivocally rejected the assertion that TRG and/or TRI were owed or contractually entitled to "advance commissions".  By letter dated October 20, 2014, AmTrust and ATEL demanded that TRG remit the withheld premium and premium taxes on or before November 10, 2014 and advised that TRG's failure to do so would result in the termination of the TOBA and the Framework Agreement.

46.    In a separate letter, ATEL demanded that TRI return the withheld premium and premium taxes and advised that TRI's failure to do so would result in the termination of the Agency Agreement.

47.     Somma refused to cause TRG or TRI to remit the withheld premiums and premium taxes to ATEL but rather funneled the majority of the money to numerous accounts controlled by himself and his family.  Accordingly, in late October, ATEL commenced proceedings in the High Court in London under the TOBA seeking a freezing of the withheld premiums and other relief.  AmTrust and ATEL also initiated proceedings against TRG and TRI in the Italian Criminal Court and sought an injunction from the Commercial Court in Milan.

48.     AmTrust and ATEL also terminated all of their agreements with TRG and TRI based on the counterparties' breaches.

49.     In late November 2014, the Italian Criminal Court issued an order freezing most of TRG's and TRI's bank accounts based on its finding that Somma had misappropriated premiums belonging to ATEL.  This order was upheld on appeal on February 12, 2015.

50.     On December  10, 2014, the High Court in London ordered that, if the freeze imposed by the Italian Criminal Court were to be lifted, TRG was to remit to a designated account the premiums owed under the TOBA (approximately €32,000,000, less deductions for commissions owed on premium actually received) and the monies were to remain frozen pending the outcome of the U.K. proceedings.  An appeal of that order by TRG was dismissed on April 30, 2015.

51.     On December 12, 2014, the Court of Milan ordered TRI to deposit the sum €18,949,439.73 , representing all premiums and premium taxes it had collected on behalf of ATEL since September 21, 2014, net of contractually owed commissions, into designated accounts and that such accounts be judicially seized.  TRI's appeal of that order was rejected on or about March 27, 2015.

52.     On June 16, 2015, IVASS, the Italian insurance regulator, made an order following disciplinary proceedings it had initiated against Somma and others.  IVASS ordered that Somma be expelled as a regulated broker on the grounds that TRG and TRI had violated Italian insurance law regarding the segregation of accounts where brokers and agents hold premiums due to an insurer and that Somma was liable for such violations because he was the sole decision maker in TRG and TRI.

53.     IVASS observed that, although it was ultimately a matter for the arbitrators to determine, the claim to advance commission had no place under the TOBA and the Framework Agreement and was inconsistent with the parties' past practices.  On this basis, IVASS found that TRG's and TRI's decision to withhold advance commissions was "unilateral and, as such, unjust".

**Somma and Lacchini Scheme to Defraud AmTrust Through Corrupt Arbitrations**

54.     With his plan to unlawfully compete against AmTrust and ATEL not going as planned, the Italian insurance regulator impeding his progress, and his attempt to steal tens of millions in premium thwarted, Somma devised an audacious scheme with Lacchini to defraud vast sums from AmTrust, directly and through ATEL, by embroiling the companies in corrupt arbitrations in which they would put AmTrust and ATEL to the choice of paying exorbitant settlements or facing potentially ruinous awards issued by the corrupted arbitration panels.

55.     The Framework Agreement and the Agency Agreement each contain an arbitration clause specifying that certain (but not all) disputes are to be settled through arbitration in Milan, Italy before a three-person arbitration panel, with each party appointing one of the

arbitrators and the third arbitrator selected by agreement of the two others or, in the event the two others cannot agree, by the President of the Court of Milan.[1]

56.     On or about October 23, 2014, Somma caused TRG to issue a demand for arbitration under the Framework Agreement against AmTrust and ATEL (the "TRG Arbitration").  On or about October 27, 2014, Somma caused TRI to issue a demand for arbitration under the Agency Agreement against ATEL (the "TRI Arbitration").  Somma appointed Nicola Alessandro Saldutti as an arbitrator in each of the two proceedings.

57.     On November 12, 2014, AmTrust and ATEL appointed Prof. Antonio Gambaro to serve as an arbitrator in the TRG Arbitration.

58.     On November 21, 2014, ATEL appointed Prof. Paolo Montalenti to serve as an arbitrator in the TRI Arbitration.

59.     On information and belief, Somma instructed Saldutti, the arbitrator whom he had appointed in both the TRG Arbitration and the TRI Arbitration, to avoid reaching agreement with Prof. Gambaro on the appointment of a third arbitrator in the TRG Arbitration or with Prof. Montalenti about the appointment of a third arbitrator in the TRI Arbitration.  Saldutti did, in fact, refuse even to discuss the third-arbitrator position with both Prof. Gambaro and Prof. Montalenti.

60.     On or about February 11, 2015, the President of the Court of Milan appointed Defendant Lacchini as the Chairman or President of the panel for the TRG Arbitration (the "TRG Arbitration Panel").

---

[1]  AmTrust and ATEL maintain that disputes concerning policies issued under the TOBA are subject to English law and the jurisdiction of the English courts.

61.     On or about March 2, 2015, a deputy of the President of the Court of  Milan appointed Lacchini as the Chairman of the arbitration panel presiding over the TRI Arbitration (the "TRI Arbitration Panel").

62.     At or near the time Lacchini was appointed as the President of the TRG Arbitration Panel and the TRI Arbitration Panel,  Somma agreed to pay Lacchini, and Lacchini had agreed to receive from Somma, a bribe to ensure a favorable outcome for TRG and TRI in the two Arbitrations.  According to Somma's own writing, the amount of the bribe was 10 percent of the sums obtained from AmTrust, directly and through ATEL, in the TRG Arbitration and the TRI Arbitration.

63.     Lacchini's ability to deliver a favorable outcome for Somma in the two Arbitrations emanated at a minimum from his position as the president of each Arbitration, with the ability to cast a decisive vote in the expected event the other two arbitrators each voted in favor the party that appointed them.  Beyond that, however, Lacchini also had a pre-existing relationship with Saldutti, the arbitrator Somma appointed for TRG and TRI, which was not disclosed to AmTrust or ATEL, giving Lacchini a further ability to assert control over the proceedings.  Saldutti had represented Lacchini as counsel in Italian court proceedings during 2015.

64.     On April 2, 2015, TRG served its statement of claim in the TRG Arbitration. TRG's statement of claim included an unremarkable (though meritless) claim to insurance brokerage commissions of more than €16 million.  But in addition, TRG asserted a fantastical and coercive claim for €1.247 ***billion*** in damages for AmTrust's and ATEL's purported breach and improper termination of the Framework Agreement.  This damages claim had no basis in

13

fact or law and, on information and belief, was asserted in bad faith as a means to defraud AmTrust.

65.     On April 15, 2015, TRI served its statement of claim in the TRI Arbitration. TRI's statement of claim included an unremarkable (though meritless) claim to insurance agency commissions of approximately €80 million.  But in addition, TRI asserted a fantastical and coercive claim for €1.647 **billion** in damages for ATEL's purported breach and improper termination of the Agency Agreement.  This claim had no basis in fact or law and, on information and belief, was asserted in bad faith as a means to defraud AmTrust.

66.     Also in May 2015**,** persons unknown delivered a box containing nine bullets to the residence of the most senior executive of ATEL's Italian branch.  The number of the bullets corresponded to the number of members in the household, as the senior executive and his wife have seven children.

67.     On July 28, 2015, after AmTrust and ATEL had served answers to TRG's and TRI's statements of claim, the TRG Arbitration Panel and the TRI Arbitration Panel each issued an order (the "July Orders") directing that experts be appointed, on an unusually expedited basis, to evaluate the quantum of the commissions owed to TRI and TRG.  The July Order issued in the TRI Arbitration went one-step more.  It purported to require the experts to evaluate the amount of damages suffered by TRI by reason of ATEL's alleged breach before the tribunals gave consideration to the merits of TRG's and TRI's claims.  There was no mention of examining the damages suffered by AmTrust and ATEL by reason of TRG and TRI stealing premium and premium tax.  The July Orders didn't explain why a damages analysis was even necessary or desirable at such an early stage of the TRI proceeding.  The July Orders were extremely unusual

and, on information and belief, by design, alarming to AmTrust, because they indicated that the Panel was prepared to assess damages before it had even considered liability.

68.     Pursuant to the July Orders, Mr. Stefano Morri and Prof. Raffaele Trequeattrini were appointed to evaluate the quantum of the claims in the TRG Arbitration, and Prof. Giorgio Guatri and Prof. Domenico Celenza were appointed to quantify the claims in the TRI Arbitration. Of these experts, at least Prof. Celenza was connected to and possibly controlled by Somma and/or Lacchini, as later in 2015, Lacchini established a company called Lacchini & Associates S.R.L. and named Celenza as its sole director.  As with Lacchini's relationship to Saldutti, Lacchini's relationship with Celenza was never disclosed to AmTrust or ATEL.

69.     On information and belief, Somma arranged for Lacchini to procure these orders as a means to put increased pressure on AmTrust and ATEL by portending unfavorable developments for them in the arbitration.

70.     Somma also used the July Orders to attempt to exert downward pressure on AmTrust's publicly-traded stock, as a means to further pressure AmTrust in relation to the Arbitrations.  On July 30, 2015, two days after the July Orders were issued, Somma caused TRG to publish an English-language press release about them on TRG's website, which asserted that TRG was seeking *"over 2 billion euros"* in damages from AmTrust and ATEL and that the "Arbitral Tribunals" had appointed technical experts to quantify the "commissions and damages".  That same day, TRG sent the press release via email to financial analysts in the United States who cover AmTrust for purposes of opining on its stock.  Evidencing the harmfully confusing effect of Somma's actions, one such analyst, at Compass Point Research and Trading in New York, promptly contacted AmTrust to ask whether AmTrust had lost its arbitration against TRG.

71.     A week later, on August 5, 2015, an article appeared in the financial newspaper MF announcing that "super-consultants" were brought to the "legal battle for billions, with manager Antonio Somma facing off AmTrust, the American insurance giant".  A source from TRG was quoted in the article as stating that TRG sought "over 2 billion euros" and that "this is a figure that . . . according to the manager would affect the solidity of the USA group".

72.     Somma's efforts to use the media against AmTrust in the summer of 2015 were not his first.  Within days of filing the TRG and TRI Arbitrations, in early November 2014, Somma sent a letter AmTrust's sell-side analysts, many of whom are located in New York, in a purported effort to rebut statements made by Barry Zyskind during an analyst call for the third-quarter of 2015.  Somma wrote to the analysts that AmTrust owed TRG €98 million in "advance commissions" and millions more in penalties and compensation.  TRG is a private company, based outside of the United States and with no shares traded here.  Somma thus had no reason to make such claims to analysts covering AmTrust except to attempt to put downward pressure on AmTrust's stock and thereby exert pressure on AmTrust in relation to the Arbitrations.

73.     Also in November 2014, Somma emailed analysts covering AmTrust, including a New York-based analyst at BHR Capital, an Italian newspaper article questioning AmTrust's solvency.

74.     On August 15, 2015, ATEL filed a petition in the TRI Arbitration in which it asked the TRI Arbitration Panel to amend the July 28 Order issued in that proceeding to delete the provision that required the experts to quantify damages in advance of any finding of liability on the part of ATEL and to issue orders necessary to ensure the confidentiality of the arbitration.  ATEL's petition was rejected.

**AmTrust Uncovers the Corruption of the Arbitrations**

75.     During the remainder of 2015 and into 2016, AmTrust and ATEL continued participating in the TRG and TRI Arbitrations according to the schedules ordered by the presiding panels. Among other things AmTrust and ATEL attended meetings with the panels, retained experts, reviewed and responded to pleadings submitted by TRG and TRI, and reviewed technical briefs prepared by the panels' experts.

76.     In late 2015 and early 2016, in a further attempt to exert pressure on AmTrust, Somma sent a series of taunting and threatening text messages relating to the TRG and TRI Arbitrations to the United States mobile phones of AmTrust's CEO Barry Zyskind and AmTrust Executive Vice President Adam Karkowsky.

77.     On September 28, 2015, Somma texted Mr. Karkowsky, "Hi!  I saw you're investing a lot of monies!  Better keep some, you may need them in the future!  Wish you a great week ciao"

78.     On October 26, 2015, Somma texted Mr. Karkowsky, "Keep your monies, do not invest in real estate."

79.     On November 3, 2015, Somma texted Mr. Karkowsky, "Having belief means having hope.  There's a saying that states: 'He who lives upon hope will die fasting.'  Bye bye and have a good day."

80.     On November 23, 2015, Somma texted Mr. Karkowsky, "Hello Adam, how are you?  I noticed with great regret that AmTrust stock is lowering a lot.  Do I have to worry about the monies you have to give me??  All my best to you and your family."

81.     On November 24, 2015, Somma texted Mr. Zyskind, "my friend, I hope you and your family are comfortable, I think you have to start to get the money, thanks."

82.     On January 8, 2016, Somma texted Mr. Karkowsky, "Hello Adam, how are you? I noticed with great regret that AmTrust stock is lowering a lot.  Do I have to worry about the monies you have to give me?"

83.     Several days later on January 9, 2016, Somma texted Zyskind, "Hi Barry, how are you?  I noticed with great regret that AmTrust stock is lowering a lot.  Do I have to worry about the monies you have to give me?  Best regards, Antonio."

84.     The following month, on February 12, 2016, Somma texted Zyskind, "My friend I saw that despite the excellent results, the shares of your company are not doing so well.  I am very sorry about that.  Do you need help?  If so please do not hesitate to contact me, regards Antonio."

85.     Around this same time period, having grown suspicious of the unusual conduct of the TRG and TRI Arbitrations and the aggressive behavior on the part of Somma, AmTrust retained a business intelligence firm to investigate Somma and the Arbitrations.  The intelligence firm arranged for two of its employees (the "Investigators") to meet with Somma under the pretext of introducing him to Chinese investors interested in entering the Italian insurance market.

86.     The meeting, which was voice recorded, took place on February 12, 2016 in Rome, Italy.  During the meeting, Somma described for the Investigators the particulars of the medical malpractice market in Italy, his importance within that market and the success he had achieved in it.  He discussed with the Investigators the possibility of entering into an insurance business venture with the Chinese investors the Investigators purported to represent.

87.     Purporting to perform due diligence, the Investigators asked Somma about his business relationship with AmTrust and the ongoing legal dispute.  Somma, discussing the TRG

18

and TRI Arbitrations, claimed that the dispute had arisen from a plot by AmTrust to get the benefit of his knowledge of the Italian insurance market and then discard him.  He then told the Investigators that the dispute would be resolved on November 8, 2016 and that the result would be a decision awarding him 400 million Euros.

88.     Shortly thereafter, one of the Investigators ("Investigator 1") left the table briefly. The other Investigator ("Investigator 2") then asked Somma why he was so sure he would prevail against AmTrust.  Somma responded, "I have control" over the proceedings.  Prompted to explain, Somma stated "The arbitration is a man" and rubbed his thumb against his fingers in a gesture commonly understood to indicate money.  Investigator 2 remarked, "That's the Italian way," and Somma responded by again rubbing his thumb against his fingers and saying, in substance, that Italians can be bought but Americans cannot.  Investigator 1 then returned to the table, and Somma told him, in Italian, that Investigator 2 (who purported not to speak Italian) had asked him some "indiscrete questions" and that he should be told to keep the answers to those questions confidential.

89.     Later in the conversation, Somma reiterated that he had an unusual relationship with the president of the TRG and TRI Arbitrations.  He also predicted that AmTrust would attempt to settle with him because, as a public company, it would be concerned about the prospect of a 400 million or 500 million Euro judgment against it.  Somma stated he would be willing to settle with AmTrust for 200 million to 250 million Euros.

90.     Investigator 1 then asked Somma if he could ask him something "very, very, very private."  When Somma did not object, Investigator 1 asked Somma how much he had paid the president of the TRG and TRI Arbitrations, stating in particular, "[H]ow much do you need to pay . . . I don't want to say who . . . how much do you need . . . how much?  10 million?"

Somma responded by requesting a piece of paper and, provided one, wrote the figure "10%".

Somma then said to the Investigators, "What I wrote to you tonight . . . not even my wife

knows."  A copy of the paper bearing Somma's notation is reproduced below:



91.     The business intelligence firm AmTrust retained also arranged a meeting with

Lacchini under the pretense of seeking Lacchini's involvement in a new business academy being

established in the Middle East by a private equity consulting firm.  The meeting took place in

Rome, Italy on February 29, 2016 and was voice recorded.  The investigator meeting with

Lacchini questioned him about his experience serving as an arbitrator, under the guise of needing

advice about arbitrations in which his business was involved.  He asked Lacchini whether it was

possible "to ensure the result of the arbitration."   Lacchini responded, "Depends, I can give you

some assurance in domestic arbitrations.  Domestic arbitration I can give you some assurance . . .

In Italy, I can give you really a good contribution."

92.     Continuing, Lacchini boasted that he is "part of some of the most important

corporate arbitration" and that such arbitrations brought a "lot of benefits . . . that you can share

in."  Lacchini further explained that "the president" of the arbitration "is the key person" and that, due to his connections, he had the ability to be appointed as the president of arbitrations in Italy.  Shortly thereafter, Lacchini stated that when he is the president of an arbitration, he can assure the result of it, and he bragged about "amazing results" he had achieved in arbitrations in Italy, including a result he obtained for a party asserting claims against Deutsche Bank. Referring, on information and belief, to whomever he was conspiring with against Deutsche Bank in that case, Lacchini bragged, "So we had 400 million claim out for example, is that a domestic contract so we had a very good result . . . ."

93.     Apparently referring to the TRG and TRI Arbitration, Lacchini then stated "[F]or example now I have a huge arbitration case, perhaps the most important case, now, in Italy, but it is a domestic arbitration.  I am president of the Court. . . . It is an arbitration about insurance." In the context of the conversation, it may be reasonably inferred that Lacchini was boasting that he had been bribed to deliver a result in the Arbitrations for Somma.

94.     In addition to the proof developed from its investigation, AmTrust also received independent evidence of Somma's bribery of Lacchini from a consultant who reported that he was advised by two insurance professionals close to Somma, an insurance broker named Angelo Coviello and an insurance appraiser named Donato Carrese, that Somma had stated to them that he was certain of "the positive outcome of arbitration proceedings" because of his "direct relationship" with the president of the arbitration panels, Lacchini.

95.     On March 4, 2015, AmTrust and ATEL filed a petition to the President of the Milan Court requesting the dismissal of Lacchini as chairman in the TRG and TRI Arbitrations. Both Arbitrations have since been formally suspended by their respective tribunals, although Lacchini has thus far not resigned from either Arbitration.  As of the time of the suspensions,

neither the TRG Arbitration Panel nor the TRI Arbitration Panel had scheduled hearings on the merits of the parties' claims.

96.     Prior to the suspension of the Arbitrations, Lacchini had invoiced AmTrust and/or ATEL more than $471,000 for his services in the Arbitrations, and his invoices had been fully paid.

## FIRST CAUSE OF ACTION
## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## (18 U.S.C. § 1962(c))

97.     AmTrust incorporates by reference all the foregoing allegations as if fully set forth herein.

98.     This is a claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq., and particularly under 18 U.S.C. § 1962(c).

99.     AmTrust is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

100.    Defendants Somma and Lacchini are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

101.    During the period from on or about October 2014 through March 2016, Defendants conducted and participated in the conduct of the affairs of an enterprise engaged in or affecting foreign commerce through a pattern or racketeering activity.

102.    The TRG Arbitration Panel and the TRI Arbitration Panel are each a distinct enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) inasmuch as each is comprised of individuals (*i.e.,* the arbitrators) associated in fact for a common and ongoing purpose (*i.e.,* to arbitrate the dispute before them) and with each person playing a specific and ongoing role in an identifiable structure (*i.e.,* as either the president of the arbitration panel or a party-appointed arbitrator).

103.    The TRG Arbitration Panel and the TRI Arbitration Panel each affected foreign

commerce within the meaning of 18 U.S.C. § 1962(c) by engaging in and conducting

international arbitration.

104.    Defendants Somma and Lacchini were each employed by or associated with both

the TRG Arbitration Panel and the TRI Arbitration Panel within the meaning of 18 U.S.C.

§ 1962(c), Somma as a party to the arbitration each Arbitration Panel was adjudicating and

Lacchini as the president of each Arbitration Panel.

105.    Defendants Somma and Lacchini each conducted or participated, directly or

indirectly, in the conduct of the affairs of the TRG Arbitration Panel and the TRI Arbitration

Panel through a pattern of racketeering activity, within the meaning of 18 U.S.C. §§ 1961(5) and

1962(c), consisting of commercial bribing in the first degree, in violation of New York Penal

Law § 180.03 (Somma); commercial bribe receiving in the first degree, in violation of New York

Penal Law § 180.08 (Lacchini); and repeated acts of wire fraud, in violation of 18 U.S.C. § 1343

(Somma and Lacchini).

106.    Defendants' racketeering activity was in furtherance of a scheme to defraud and

obtain money from AmTrust by false pretenses by inducing AmTrust, and its wholly owned

subsidiary ATEL, to participate in the TRG Arbitration, and inducing AmTrust's wholly-owned

subsidiary ATEL to participate in the TRI Arbitration, by failing to disclose that those

Arbitrations would be conducted in an corrupt and dishonest manner, because Somma had bribed

Lacchini to steer the Arbitrations against AmTrust and ATEL irrespective of the evidence and

the merits of the parties' claims.  The object of the scheme was to induce AmTrust and ATEL

into paying enormous settlements through adverse rulings in the Arbitrations, such as the July

Orders, procured through Lacchini's purchased and corrupt influence, or generate an enormous

arbitration award against AmTrust and ATEL in the TRG Arbitration and against ATEL in the TRI Arbitration.

107.    In furtherance of the aforementioned scheme, Defendants committed at least the following predicate acts of racketeering in connection with the TRG Arbitration and the TRI Arbitration:

a.    In or about approximately February 2015, without AmTrust's consent, Somma offered or agreed to confer a benefit exceeding $1,000 on Lacchini with intent to influence his conduct in relation to the TRG Arbitration and the TRI Arbitration and thereby cause harm in excess of $250 to AmTrust, which had employed Lacchini to serve as an arbitrator in those Arbitrations, in violation of New York Penal Law § 180.03.

b.    In or after approximately February 2015, without AmTrust's consent, Lacchini solicited or agreed to accept a benefit from Somma upon an agreement or understanding that such benefit would influence his conduct in relation to the TRG Arbitration and the TRI Arbitration and thereby cause harm in excess of $250 to AmTrust, which had employed Lacchini to serve as an arbitrator in those Arbitrations, in violation of New York Penal Law § 180.08.

108.    In furtherance of the aforementioned scheme, Defendants committed at least the following predicate acts of racketeering in connection with the TRG Arbitration:  On numerous occasions, beginning in October 2014 and continuing through February 2016, Defendants having devised or intending to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, for the purpose of executing such scheme or artifice or attempting so to do, used or caused to be used interstate wires, including through the sending of facsimiles, electronic mail, and SMS messages.  To wit, the following predicate acts were

24

performed at the direction of, and/or were foreseeable to, Defendants in furtherance of their fraudulent scheme to scheme to defraud and obtain money from AmTrust by false pretenses by inducing AmTrust to participate in the TRG Arbitration, and inducing AmTrust's wholly-owned subsidiary ATEL to participate in the TRG Arbitration and the TRI Arbitration, by failing to disclose that those Arbitrations would be conducted in an corrupt and dishonest manner:

      a.     On or about October 23, 2014, Somma sent or caused to be sent a demand for arbitration against AmTrust and ATEL to AmTrust by email.

      b.     On or about November 6, 2014, Somma sent or caused to be sent a letter asserting that AmTrust owed TRG hundreds of millions of dollars in commissions fines and penalties to a United States-based analyst at FBR Capital Markets, by email.

      c.     On or about November 10, 2014, Somma sent or caused to be sent to that same analyst and another analyst an email questioning how ATEL, which has a net asset of 202 million euros could face a 550 million euro claim by TRG.

      d.     On or about April 2, 2015, Somma sent or caused to be sent TRG's statement of claim in the TRG Arbitration to AmTrust by email.

      e.     On or about June 8, 2015, Somma and Lacchini sent or caused to be sent a procedural order of the TRG Arbitration Panel to AmTrust by email.

      f.     On or about June 22, 2015, Somma sent or caused to be sent TRG's reply in support of its statement of claim in the TRG Arbitration to AmTrust by email.

      g.     On or about July 28, 2015, Somma and Lacchini sent or caused to be sent a procedural order of the TRG Arbitration Panel to AmTrust by email.

      h.    On or about July 30, 2015, Somma sent or caused to be sent an email containing misleading information concerning the TRG Arbitration to one or more analysts covering AmTrust.

      i.    On or about September 12, 2015, Somma sent or caused to be sent a notice of TRG's appointment of experts in the TRG Arbitration to AmTrust by email.

      j.    On or about September 22, 2015, Somma sent or caused to be sent a report of its experts in the TRG Arbitration to AmTrust by email.

      k.    On September 28, 2015, Somma sent or caused to be sent an SMS message to Adam Karkowsky stating, "Hi!  I saw you're investing a lot of monies!  Better keep some, you may need them in the future!  Wish you a great week ciao"

      l.    On or about October 26, 2015, Somma sent or caused to be sent an SMS message to Adam Karkowsky stating, "Keep your monies, do not invest in real estate."

      m.    On or about October 27, 2015, Somma and Lacchini sent or caused to be sent an order of the TRG Arbitration Panel relating to fees and costs to AmTrust by email.

      n.    On or about November 3, 2015, Somma sent or caused to sent an SMS message to Adam Karkowsky stating, "Having belief means having hope.  There's a saying that states: 'He who lives upon hope will die fasting.'  Bye and have a good day."

      o.    On or about November 23, 2015, Somma sent or caused to sent an SMS message to Adam Karkowsky stating, "Hello Adam, how are you?  I noticed with great regret that AmTrust stock is lowering a lot.  Do I have to worry about the monies you have to give me??  All my best to you and your family."

p.      On November 24, 2015, Somma sent or caused to be sent an SMS message to Barry Zyskind stating, "my friend, I hope you and your family are comfortable, I think you have to start to get the money, thanks."

q.      On or about November 25, 2015, Somma sent or caused to be sent a motion for document production in the TRG Arbitration to AmTrust by email.

r.      On or about November 27, 2015, Somma and Lacchini sent or caused to be sent a procedural order of the TRG Arbitration Panel to AmTrust by email.

s.      On or about December 23, 2015, Somma and Lacchini sent or caused to be sent a procedural order of the TRG Arbitration Panel to AmTrust by email.

t.      On January 8, 2016, Somma sent or caused to be sent an SMS message to Adam Karkowsky stating, "Hello Adam, how are you?  I noticed with great regret that AmTrust stock is lowering a lot.  Do I have to worry about the monies you have to give me?"

u.      On or about January 9, 2016, Somma sent or caused to be sent an SMS message to Barry Zyskind stating, "Hi Barry, how are you?  I noticed with great regret that AmTrust stock is lowering a lot.  Do I have to worry about the monies you have to give me?  Best regards, Antonio."

v.      On or about February 12, 2016, Somma sent or caused to be sent an SMS message to Barry Zyskind stating, "My friend I saw that despite the excellent results, the shares of your company are not doing so well.  I am very sorry about that.  Do you need help?  If so please do not hesitate to contact me, regards Antonio."

w.      On or about February 19, 2016, Somma and Lacchini sent or caused to be sent a procedural order of the TRG Arbitration Panel to AmTrust by email.

109.    In furtherance of the aforementioned scheme, Defendants committed at least the following predicate acts of racketeering in connection with the TRI Arbitration:  On numerous occasions, beginning in October 2014 and continuing through February 2016, Defendants having devised or intending to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, for the purpose of executing such scheme or artifice or attempting so to do, used or caused to be used interstate wires, including through the sending of facsimiles, electronic mail, and SMS messages.  To wit, the following predicate acts were performed at the direction of, and/or were foreseeable to, Defendants in furtherance of their fraudulent scheme to scheme to defraud and obtain money from AmTrust by false pretenses by inducing AmTrust to participate in the TRG Arbitration, and inducing AmTrust's wholly-owned subsidiary ATEL to participate in the TRG Arbitration and the TRI Arbitration, by failing to disclose that those Arbitrations would be conducted in an corrupt and dishonest manner:

       a.      On or about October 27, 2014, Somma sent or caused to be sent a demand for arbitration against ATEL to AmTrust by email.

       b.      On or about April 10, 2015, Somma sent or caused to be sent TRI's statement of claim in the TRI Arbitration to AmTrust by email.

       c.      On or about June 15, 2015, Somma and Lacchini sent or caused to be sent a procedural order of the TRI Arbitration Panel to AmTrust by email.

       d.      On or about June 24, 2015, Somma sent or caused to be sent TRI's reply in support of its statement of claim in the TRI Arbitration to AmTrust by email.

       e.      On or about July 28, 2015, Somma and Lacchini sent or caused to be sent a procedural order of the TRI Arbitration Panel to AmTrust by email.

f.      On or about August 26, 2015, Somma sent or caused to be sent TRI's reply to ATEL's motion regarding the July 28 Orders to AmTrust by email.

g.      On or about September 29, 2015, Somma sent or caused to be sent a report by TRI's experts in the TRI Arbitration to AmTrust by email.

h.      On or about October 13, 2015, Somma sent or caused to be sent a report by TRI's experts in the TRI Arbitration to AmTrust by email.

i.      On or about October 21, 2015, Somma sent or caused to be sent a report by TRI's experts in the TRI Arbitration to AmTrust by email.

j.      On or about October 26, 2015, Somma and Lacchini sent or caused to be sent a procedural order of the TRI Arbitration Panel to AmTrust by email.

k.      On or about November 6, 2015, Somma and Lacchini sent or caused to be sent a procedural order of the TRI Arbitration Panel to AmTrust by email.

l.      On or about November 24, 2015, Somma and Lacchini sent or caused to be sent a procedural order of the TRI Arbitration Panel to AmTrust by email.

m.      On or about December 2, 2015, Somma sent or caused to be sent a motion by TRI regarding document production in the TRI Arbitration to AmTrust by email

n.      On or about December 9, 2015, Somma and Lacchini sent or caused to be sent a procedural order of the TRI Arbitration Panel to AmTrust by email.

o.      On or about January 18, 2015, Somma and Lacchini sent or caused to be sent a procedural order of the TRI Arbitration Panel to AmTrust by email.

p.      On or about February 19, 2016, Somma sent or caused to be sent a report by TRI's experts in the TRI Arbitration to AmTrust by email.

110.    The conduct of Defendants' scheme was continuous, escalating and of substantial

duration and would have continued well beyond two years had it not been discovered and

interrupted by AmTrust.  Further, Lacchini's admitted history of corrupting arbitrations

evidences that Defendants' criminal conduct is of a continuing nature.  Each Defendant's last

racketeering activity occurred after the effective date of 18 U.S.C. § 1961, et seq., and each

Defendant's last racketeering act occurred within 10 years after the commission of a prior act of

racketeering activity.

111.    AmTrust has suffered substantial injury to its business and property as a direct

and proximate result of Defendants' above-described violation of 18 U.S.C. § 1962(c), including

but not limited to the costs and expenses incurred in participating in the TRG Arbitration and the

reputational injury inflicted by Defendants' efforts to drive down AmTrust's stock price in

furtherance of their scheme, as alleged above.

112.    Pursuant to 18 U.S.C. § 1964(c), AmTrust is entitled to recover treble its

compensatory damages, plus interest, costs and attorneys fees.

## SECOND CAUSE OF ACTION
### RACKETEERING CONSPIRACY
### (18 U.S.C. § 1962(d))

113.    AmTrust incorporates by reference all the foregoing allegations as if fully set

forth herein.

114.    This is a claim under the Racketeer Influenced and Corrupt Organizations Act, 18

U.S.C. § 1961, et seq., and particularly under 18 U.S.C. § 1962(d).

115.    During the period from on or about October 2014 through March 2016,

Defendants Somma and Lacchini conspired and agreed to violate the provisions of 18 U.S.C.

§ 1962(c) by conducting of the affairs of an enterprise engaged in or affecting foreign commerce through a pattern or racketeering activity.

116.    Defendants Somma and Lacchini conspired and agreed to conduct of the affairs of the TRG Arbitration Panel and the TRI Arbitration Panel through a pattern of racketeering activity, within the meaning of 18 U.S.C. §§ 1961(5) and 1962(c), consisting of commercial bribing in the first degree, in violation of New York Penal Law § 180.03; commercial bribe receiving in the first degree, in violation of New York Penal Law § 180.08; and repeated acts of wire fraud, in violation of 18 U.S.C. § 1343.

117.    Defendants' conspiracy was in furtherance of a scheme to defraud and obtain money from AmTrust by false pretenses by inducing AmTrust to participate in the TRG Arbitration, and inducing AmTrust's wholly-owned subsidiary ATEL to participate in the TRG Arbitration and the TRI Arbitration, by failing to disclose that those Arbitrations would be conducted in a corrupt and dishonest manner.  The object of the scheme was to induce AmTrust and ATEL into paying enormous settlements through adverse rulings in the Arbitrations, such as the July Orders, procured through Lacchini's purchased and corrupt influence, or generate an enormous arbitration award against AmTrust and ATEL in the TRG Arbitration and against ATEL in the TRI Arbitration.

118.    Each Defendant committed at least one over act in furtherance of the conspiracy. To wit, Somma offered, and Lacchini agreed to receive, a bribe to corrupt the TRG Arbitration and the TRI Arbitration.  Additionally, as alleged in paragraphs 104 and 105, *supra*, each defendant sent or caused to be sent various items to AmTrust via email in furtherance of their scheme to defraud.

119.    The conduct of Defendants' scheme was continuous and of substantial duration and would have continued well beyond two years had it not been discovered and interrupted by AmTrust.  Further, Lacchini's admitted history of corrupting arbitrations evidences that Defendants' criminal conduct is of a continuing nature.

120.    AmTrust has suffered substantial injury to its business and property as a direct and proximate result of Defendants' above-described violation of 18 U.S.C. § 1962(c), including but not limited to the costs and expenses incurred in participating in the TRG Arbitration and and the reputational injury inflicted by Defendants' efforts to drive down AmTrust's stock price in furtherance of their scheme, as alleged above.

121.    Pursuant to 18 U.S.C. § 1964(c), AmTrust is entitled to recover treble its compensatory damages, plus interest, costs and attorneys fees.

### THIRD CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH CONTRACT

122.    AmTrust incorporates by reference all the foregoing allegations as if fully set forth herein.

123.    AmTrust and Lacchini were parties to a contract under which Lacchini, in exchange for substantial financial consideration, was obligated to render honest and impartial service as an arbitrator in the TRG Arbitration.

124.    AmTrust fully performed all of its obligations under the aforementioned contract with Lacchini and was entitled to full performance from Lacchini of his obligations under the contract.

125.    Somma, fully aware of the aforementioned contract between AmTrust and Lacchini, and without privilege or justification, knowingly and deliberately induced Lacchini to

breach the contract by agreeing to pay him a bribe to administer and decide the TRG Arbitration in a corrupt manner.

126.    AmTrust has suffered financial and reputational harm as a result of Somma's tortious interference.

## PRAYER FOR RELIEF

WHEREFORE AmTrust prays for relief as follows:

A.      An award of compensatory damages against Somma and Lacchini in an amount to

be proven at trial but including compensation for AmTrust's costs and expenses incurred in

participating in the TRG Arbitration, compensation for the reputational injury resulting from

Defendants' efforts to drive down AmTrust's stock price in furtherance of Defendants' illicit

scheme, and compensation for any other harm suffered on account of Defendants' illicit scheme;

B.      Treble damages under RICO;

C.      Punitive damages;

D.      Prejudgment interest at the maximum legal rate; and

E.      Such other and further relief as the Court may deem just and proper.

DATED:    New York, New York
          April 6, 2016

                                        QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP


                                        By:/s/ Kevin S. Reed
                                        _____
                                            Michael B. Carlinsky
                                            Kevin S. Reed

                                        51 Madison Avenue, 22nd Floor
                                        New York, New York  10010-1601
                                        (212) 849-7000
                                        Fax: (212) 849-7100
                                        Email: michaelcarlinsky@quinnemanuel.com
                                               kevinreed@quinnemanuel.com

                                        *Attorneys for Plaintiff AmTrust Financial
                                        Services, Inc.*