UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

AMTRUST FINANCIAL SERVICES, INC.,

Plaintiff,

-v-

MARCO LACCHINI,

Defendant.

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  2-23-17

16 Civ. 2575 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

　　This lawsuit, brought in federal court in New York, alleges that an Italian citizen who presided over an arbitration in Italy did so corruptly.  Plaintiff AmTrust Financial Services, Inc. ("AmTrust") brings claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, *et seq.* ("RICO"), and under New York law for tortious interference with contract.  AmTrust claims that defendant Marco Lacchini presided over a rigged arbitration in Italy, in which, in exchange for a bribe from AmTrust's adversary, he rendered outcomes adverse to AmTrust, costing it hundreds of millions of dollars.

　　Lacchini now moves to dismiss.  He argues, under Federal Rule of Civil Procedure 12(b), that this Court lacks personal jurisdiction over him and that the complaint fails to state a claim.  He separately seeks dismissal based on the doctrine of *forum non conveniens*.

　　For the following reasons, the Court grants the motion to dismiss for lack of personal jurisdiction.  The Court therefore does not reach Lacchini's other arguments for dismissal.

I.      **Background**[1]

AmTrust and its subsidiaries operate as a multi-national property and casualty insurance business.  Complaint ¶ 13.  Its claims here arise from a complex series of events, in which, as alleged, AmTrust attempted to enter the medical malpractice insurance market in Italy but came into conflict with an Italian businessman named Antonio Somma.  AmTrust alleges that Somma—a former defendant in this case, with whom AmTrust has settled—bribed Lacchini, an arbitrator presiding over a proceeding involving Somma's affiliates and AmTrust, to favor Somma's interests.  The Court recounts here the central allegations in that dispute and the facts most relevant to the issue of whether the Court possesses personal jurisdiction over Lacchini.

A.      **Factual Background**

1.      **The Dispute Between AmTrust/ATEL and Somma**

Around December 2009, AmTrust began to underwrite medical malpractice insurance in Italy through its London-based subsidiary, AmTrust Europe Limited ("ATEL").  *Id.* ¶ 3, 14.  ATEL later entered into an arrangement with a company established by Somma, Trust Risk Group, S.p.a. ("TRG"), under which TRG would act as an insurance broker for ATEL on a non-exclusive basis in the medical malpractice insurance market in Italy.  *Id.* ¶ 15.  Under this arrangement, TRG would collect and remit premiums on policies underwritten by ATEL and would receive a commission on those premiums.  *Id.* ¶ 16.

---

[1] The following summary of AmTrust's factual allegations is drawn from the Complaint, filed on April 6, 2016.  Dkt. 1 (the "Complaint").  In connection with Lacchini's motion to dismiss, the Court also considered the following declarations submitted by Lacchini: from Lacchini himself, Dkt. 16 ("Lacchini Declaration"), and from an attorney at the firm representing him, Abdul Azeem s/o Abdul Samad, Dkt. 17.  The Court may properly consider such materials in resolving a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2).  *See, e.g.*, *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013).

The relationship between ATEL and TRG was initially successful.  By the end of 2010, AmTrust, ATEL, and TRG were in discussions about forming an exclusive relationship in the medical malpractice market.  *Id.* ¶ 17.  AmTrust's CEO, ATEL's CEO, and Somma, TRG's CEO, met in New York and London during January and February 2011; these meetings resulted in a Framework Agreement among AmTrust, ATEL, and TRG.  *Id.* ¶ 18.  Under it, AmTrust and ATEL would have an exclusive relationship with TRG for medical malpractice insurance in the Italian market, in that AmTrust and ATEL would insure only the risks in that market that TRG presented to them.  *Id.* ¶ 19.  In 2012, ATEL established a branch in Italy, and, in May 2013, as anticipated by the parties' agreement, ATEL entered into an Agency Agreement with a TRG subsidiary called Trust Risk Italia SRL ("TRI"), under which TRI would be ATEL's agent and remit premiums and taxes monthly to ATEL's Italian branch account.  *Id.* ¶ 20.  At least seven times between early 2011 and July 2014, Somma traveled between Italy and New York City to meet with AmTrust and ATEL executives, traveling on an AmTrust corporate aircraft at least six times, typically with AmTrust or ATEL executives.  *Id.* ¶ 22.  Around April 2012, Somma moved from Naples, Italy into an apartment in Manhattan owned by TRG and lived there for four or five months.  *Id.* ¶ 23.

The relationship between AmTrust and Somma later disintegrated.  During summer 2014, AmTrust discovered that Somma was planning to compete against AmTrust and ATEL and to use information misappropriated from ATEL to do so.  *Id.* ¶ 25.  Specifically, AmTrust learned that Somma planned to transfer TRG's existing business to a new brokerage company that he would form, and to acquire a majority stake in an insurance company.  *Id.* ¶ 26.  AmTrust also discovered that an associate of Somma's—his daughter's fiancée or boyfriend, who worked in ATEL's London office—had downloaded from an ATEL computer to a personal account,

without permission and in violation of policy, proprietary information about ATEL's claims and policies. *Id.* ¶¶ 29–40. After detecting the unauthorized downloads, ATEL asked the associate to leave and, on September 2, 2014, escorted him out of its offices. *Id.* ¶ 42. On October 5, 2014, believing that TRG was poised to compete against them, AmTrust and ATEL notified Somma that they intended to terminate the relationship with TRG, to effect an orderly separation. *Id.* ¶ 43. Somma then claimed ATEL owed him €96,963,055 in "advance commissions" on business that he anticipated would be paid on existing policies, and notified ATEL that he would withhold €50,000,000 in premiums from ATEL to reflect those commissions. *Id.* ¶ 44. AmTrust and ATEL, however, rejected Somma's claim of entitlement to "advance commissions" and terminated the arrangements with TRG and TRI. *Id.* ¶¶ 45–46, 48.

ATEL then initiated legal proceedings in London under the contract with TRG. It sought to freeze the withheld premiums. With AmTrust, ATEL also initiated proceedings against TRG and TRI in the Italian Criminal Court, and sought an injunction from the Commercial Court in Milan. *Id.* ¶ 47. ATEL prevailed initially. In late November 2014, the Italian Criminal Court froze most of TRG's and TRI's bank accounts, based on its finding that Somma had misappropriated premiums belonging to ATEL; on February 12, 2015, this order was upheld on appeal. *Id.* ¶ 49. Courts in London and Italy also froze various funds of TRG and TRI. *Id.* ¶¶ 50–51. And, on June 16, 2015, the Italian insurance regulator, IVASS, following disciplinary proceedings against Somma and others, expelled Somma as a regulated insurance broker on the grounds that TRG and TRI had violated Italian insurance law regarding the segregation of accounts in which brokers and agents hold premiums to be paid to an insurer. *Id.* ¶ 52. Somma, IVASS found, was liable for these violations as TRG and TGI's sole decision maker. *Id.*

## 2.      Somma's Alleged Scheme Involving the Arbitration and Lacchini

AmTrust alleges that Somma, with Lacchini, then devised a scheme to drag AmTrust and ATEL into arbitrations that Somma, through Lacchini, would corruptly control.

Under the agreements among AmTrust, ATEL, and TRG and TRI, specified disputes were to be settled through an arbitration in Milan conducted by a three-arbitrator panel, of which one arbitrator was to be appointed by each party and the third selected by the other two arbitrators, or, if the two arbitrators could not agree, by the President of the Court of Milan. *Id.* ¶ 55. In late October 2014, Somma caused TRG and TRI to issue demands for such arbitrations. *Id.* ¶ 56. Somma appointed the same arbitrator to each proceeding; AmTrust and ATEL appointed an arbitrator to the arbitration with TRG; ATEL appointed a different arbitrator to the arbitration with TRI. *Id.* ¶¶ 56–58. AmTrust alleges that Somma instructed his arbitrator not to agree to any person to serve as the third arbitrator, leaving the selection of the chair of each panel to the President of the Court of Milan. *Id.* ¶ 59. In February and March 2014, the President of the Court of Milan appointed Lacchini as chair of both the TRG and TRI panels. *Id.* ¶¶ 60–61.

AmTrust alleges that, around the time Lacchini was appointed to chair the TRG and TRI panels, Somma and Lacchini agreed that Somma would pay Lacchini a bribe of 10 percent of the sums TRG and TRI obtained in the arbitrations, and that Lacchini, in return, would ensure favorable outcomes for TRG and TRI. *Id.* ¶ 62. Lacchini, AmTrust alleges, had the ability to control the arbitral outcomes as the decisive vote where the party-chosen arbitrators did not agree, and because he had a relationship with the arbitrator Somma appointed. *Id.* ¶ 63.

In April 2015, TRG and TRI served their statements of claim, seeking €16 million and €80 million, respectively, in brokerage or agency commissions, and damages of €1.247 billion and €1.647 billion, respectively. *Id.* ¶¶ 64–65. In May 2015, unknown persons delivered a box

containing nine bullets to the residence of the senior executive of ATEL in Italy; the nine bullets corresponded to the nine family members in the household. *Id.* ¶ 66. On July 28, 2015, after AmTrust and ATEL answered, each panel issued an order directing that experts be appointed to assess damages issues, a move that AmTrust alleges was unusual. *Id.* ¶ 67. Undisclosed to AmTrust or ATEL, one appointed expert was the sole director of a company that Lacchini had established. *Id.* ¶ 68. AmTrust alleges that Somma prompted Lacchini to issue the orders appointing experts to pressure AmTrust and ATEL and harm their prospects in the arbitrations. *Id.* ¶ 69. Somma also caused TRG to publish press releases aimed at damaging AmTrust's stock price, by disclosing that TRG was seeking more than €2 billion in damages and that the panels had appointed damages experts. *Id.* ¶ 70. In late 2015 and 2016, AmTrust and ATEL continued to participate in the arbitrations, including unsuccessfully asking the panels to defer calculating damages until liability had been determined. *Id.* ¶¶ 74–75. Also in late 2015 and early 2016, Somma sent threatening text messages to two senior executives of AmTrust and ATEL. *Id.* ¶¶ 76–84.

### 3.   AmTrust's Investigation of Somma and Lacchini

In late 2015 or early 2016, AmTrust retained a business intelligence firm to investigate Somma and the arbitrations. *Id.* ¶ 85. On February 12, 2016, private investigators, posing as agents for foreign investors doing due diligence, met with Somma in Rome and asked him about the dispute with AmTrust. *Id.* ¶ 87. Somma stated that, in November 2016, he would prevail over AmTrust in the arbitration and would be awarded €400 million, because, he stated, he had control over the arbitral proceedings and claimed "the arbitration is a man." *Id.* ¶¶ 87–88. Somma explained that he had a relationship with the arbitral panel chair, Lacchini, and predicted that AmTrust ultimately would settle with him, out of concern about a large adverse judgment

for €200–250 million.  *Id.* ¶ 89.  An investigator asked Somma how much he paid the chair of the arbitral panels.  *Id.* ¶ 90.  Somma then wrote "10%" on a piece of paper, stating that that information was very secret.  *Id.*

On February 29, 2016, an AmTrust investigator arranged a meeting with Lacchini in Rome.  *Id.* ¶ 91.  The investigator posed as seeking Lacchini's involvement in a new business academy.  *Id.*  The investigator asked Lacchini whether he could ensure the results of an arbitration; Lacchini responded that it depended, but that he could give "some assurance in domestic arbitrations."  *Id.*  Lacchini explained that he was part of important arbitrations, had the ability be appointed an arbitral chair in Italy, and as such could assure the arbitration's result.  *Id.* ¶ 92.  In what AmTrust alleges was a reference to the TRG and TRI arbitrations, Lacchini stated that he was then chairing an arbitration about insurance, "perhaps the most important case, now, in Italy, but it is a domestic arbitration."  *Id.* ¶ 93.  AmTrust separately learned from a consultant that Somma had stated to others he was certain of a positive outcome in the arbitrations because of his "direct relationship" with panel chair Lacchini.  *Id.* ¶ 94.

On March 4, 2016, AmTrust and ATEL filed a petition to the President of the Milan Court asking that Lacchini be dismissed as the chair of the arbitral panels.  *Id.* ¶ 95.[2]  As of the date of AmTrust's Complaint, both arbitrations had been suspended by their respective tribunals, but Lacchini remained chair of each.  *Id.*

---

[2] The Complaint alleges that this filing was on March 4, 2015.  Complaint ¶ 95.  The Court infers that this was a typographical error, given the dates of the other allegations in the Complaint.

### B.      AmTrust's Claims in This Lawsuit

On April 6, 2016, AmTrust filed the Complaint against Somma and Lacchini, bringing RICO and state law claims.[3]  Dkt. 1.  The RICO claim alleges that the TRG and the TRI arbitration panels were each "enterprise[s]" within the meaning of 18 U.S.C. § 1961(4), and, as tribunals resolving international arbitrations, affected foreign commerce as required by 18 U.S.C. § 1962(c).  Complaint ¶¶ 102–03.  It alleged that arbitral party Somma and arbitrator Lacchini were each employed or associated with the enterprises.  *Id.* ¶ 104.  It alleged that Somma and Lacchini committed or conspired to commit acts that constituted a pattern of racketeering activity.  *Id.* ¶ 105, 115–16.  As to Lacchini, these include (1) receipt of a commercial bribe in the first degree, in violation of New York Penal Law § 180.08, and (2) wire fraud, in violation of 18 U.S.C. § 1343, in connection with the alleged scheme to defraud AmTrust by inducing it into participate in sham arbitrations and to pay settlements brought about through Lacchini's corrupt influence on the arbitrations.  *Id.* ¶¶ 105–06.  The particular acts that the Complaint attributes to Lacchini include soliciting or agreeing to accept a benefit from Somma in exchange for influencing the arbitration, *id.* ¶ 107(b); and, with Somma, on 13 dates between June 8, 2015 and February 19, 2016, emailing or causing to be emailed to AmTrust procedural orders or orders relating to fees and costs of the arbitrations, *id.* ¶¶ 108–09.  The Complaint does not allege that Lacchini was ever present in the United States.

### C.      Procedural History of This Litigation

On July 18, 2016, AmTrust voluntarily dismissed its claims against Somma with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).  Dkt. 9.

---

[3] In addition to its RICO claims against both defendants, AmTrust brought a state-law claim for tortious interference with contract against Somma.  Complaint ¶¶ 122–26.  Because AmTrust has voluntarily dismissed its claims against Somma, Dkt. 9, that claim is no longer operative.

On August 9, 2016, Lacchini filed a motion to dismiss, Dkt. 14, on three grounds:  (1) lack of personal jurisdiction over Lacchini; (2) *forum non conveniens*; and (3) failure to state a claim, under Rule 12(b)(6).  In support, Lacchini filed a memorandum of law, Dkt. 15, the Lacchini Declaration, Dkt. 16, and the Declaration of Abdul Azeem s/o Abdul Samad, Dkt. 17.  On September 30, 2016, AmTrust filed a memorandum of law in opposition.  Dkt. 27 ("AmTrust Opp.").  On October 14, 2016, Lacchini filed a reply.  Dkt. 29 ("Lacchini Rep.").

On October 28, 2016, the Court held an initial pretrial conference and heard argument on the motion to dismiss.  Argument focused on Lacchini's first two grounds for dismissal.  On November 10, 2015, Lacchini filed a letter providing additional information about the arbitral proceedings and the contracts between AmTrust and TRG, and between ATEL and TRI, Dkts. 31, 31-1 ("Framework Agreement"), 31-2 ("Agency Agreement"), respectively.  On November 15, 2016, AmTrust filed a letter in response, stating that it contests the materiality, but not the accuracy, of the information provided in Lacchini's supplemental letter.  Dkt. 32.

## II.   Lacchini's Motion to Dismiss for Lack of Personal Jurisdiction

As noted, Lacchini moves to dismiss on three grounds.  He argues, under Rule 12(b)(2), that this Court lacks personal jurisdiction over him; under Rule 12(b)(6), that the Complaint fails to state a claim; and on the grounds of *forum non conveniens*.  Although each of these three motions are strong, the Court need only reach one—based on lack of personal jurisdiction—to dispose of Lacchini's Complaint.  As to that motion, the Court first reviews facts relating to Lacchini's contacts—or lack thereof—with the United States, then reviews the applicable legal principles, and then assesses Lacchini's motion.

### A.      Lacchini's Contacts—Or Lack Thereof—With the United States

The following facts regarding Lacchini's contacts with New York and the United States are drawn from the Lacchini Declaration.  Strikingly, AmTrust's Complaint—other than noting that AmTrust, as a party to the arbitration over which Lacchini presided, has a principal place of business in New York, Complaint ¶ 8—does not allege any contacts between Lacchini and New York.[4]  Further, ATEL, AmTrust's subsidiary and the party in the TRI arbitration, is based in London and has a branch office in Italy.  *Id.* ¶ 14, 20.

Lacchini currently resides in Rome.  He is and has always been exclusively a citizen of Italy.  Lacchini Declaration ¶¶ 4–5; *see also* Complaint ¶ 10 ("Defendant Marco Lacchini is, on information and belief, an Italian national and a resident of Rome, Italy.").  He has never lived, owned property, conducted business, had an office, been employed by an entity, received income or revenue from goods or services rendered, solicited business or targeted customers, had a mailing address in, had a bank account in, or employed anyone in New York or anywhere else in the United States.  Lacchini Declaration ¶¶ 6–15.  Indeed, Lacchini has never even travelled to New York or anywhere else in the United States.  *Id.* ¶ 16.

Lacchini never met with AmTrust or anyone acting on its behalf in the United States; all of his contacts with representatives of AmTrust occurred in Milan.  *Id.* ¶¶ 17–18.  He has never initiated, been a plaintiff to, or participated in the filing of any legal action in New York or

---

[4] In contrast, the Complaint contains extensive and specific allegations about the presence in New York of Somma, the lead defendant in AmTrust's case as brought and the defendant as to whom the lopsided majority of factual allegations relate.  The Complaint alleges, *inter alia*, that Somma met with AmTrust's chief executive officer in New York in early 2011, Complaint ¶ 18; travelled to New York and met with AmTrust and ATEL executives at least seven times between 2011 and 2014, *id.* ¶ 22; otherwise travelled to the United States at least six other times during that period, usually with AmTrust or ATEL personnel, *id.*; and in April 2012, moved into an apartment owned by TRG at 400 Fifth Avenue in Manhattan, where he remained in residence for approximately four to five months, *id.* ¶ 23.

anywhere else in the United States, whether in his name or for his benefit.  *Id.* ¶ 21.  All correspondence concerning the arbitrations was sent by email to the parties' counsel by the secretary appointed by the arbitration panels, except, to Lacchini's knowledge, for one email in March 2016 that Lacchini sent from his professional email account to the arbitration panels and the parties' counsel, in which Lacchini noted that the arbitral proceedings had been suspended. *Id.* ¶¶ 19–20.

### B.       Applicable Legal Principles Governing Personal Jurisdiction

"[T]he plaintiff bears the burden of establishing that the court has jurisdiction over the defendant."  *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted); *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).  "Each defendant's contacts with the forum . . . must be assessed individually."  *Calder v. Jones*, 465 U.S. 783, 790 (1984) (citation omitted).

"[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction.  At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations."  *Id.* (quoting *Ball*, 902 F.2d at 197); *accord In re Terrorist Attacks*, 714 F.3d at 673 ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima facie* showing that jurisdiction exists." (citation omitted)).

"This showing may be made through the plaintiff's 'own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant.'" *S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)).  The Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor." *Dorchester*, 722 F.3d at 85 (quoting *S. New Eng. Tel.*, 624 F.3d at 138); *accord A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." (citation omitted)).  Nonetheless, the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673 (citations omitted).

In determining whether it possesses personal jurisdiction, the Court employs a two-step inquiry.  First, the Court must determine whether there is a "statutory basis for exercising personal jurisdiction." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 129 (2d Cir. 2013) (citation omitted).  A federal court applies the forum state's personal jurisdiction rules unless a federal statute "specifically provide[s] for national service of process." *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (citation omitted); *see also* Fed. R. Civ. P. 4(k)(1) ("Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant:  (A) who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located . . . or (C) when authorized by a federal statute.").  Second, the court must consider whether exercise of personal jurisdiction over the defendant is consistent with due process under the Constitution. *Licci*, 732 F.3d at 167–68.

12

As to the statutory inquiry, a federal court first determines whether the defendant is subject to the general jurisdiction of a court of the state in which the federal court sits or if the relevant statute provides for service of process.  When a claim arises under federal law and state law, through its long-arm statute, does not provide a statutory basis for exercise of personal jurisdiction, a court may then determine whether Federal Rule of Civil Procedure 4(k)(2) offers a basis for personal jurisdiction over the defendant.  *See Daventree Ltd. v. Republic of Argentina*, 349 F. Supp. 2d 736, 757–58 (S.D.N.Y. 2004).  Rule 4(k)(2) provides that:  "For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:  (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws."

The constitutional due process inquiry has two steps.  The Court must determine, first, whether the defendant has sufficient minimum contacts with the forum (the "minimum contacts") inquiry; and, if so, second, whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice" (the "reasonableness" inquiry).  *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567–68 (2d Cir. 1996) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).[5]

---

[5] When the defendant's contacts are insufficient for a state court to exercise personal jurisdiction over him or her, and the statutory basis for asserting personal jurisdiction in a case brought under federal law is Rule 4(k)(2), the relevant forum for assessing minimum contacts is the United States as a whole.  *See Porina v. Marward Shipping Co., Ltd.*, 521 F.3d 122, 127 (2d Cir. 2008) (citing *Dardana Ltd. v. Yusganskneftegaz*, 317 F.3d 202, 207 (2d Cir. 2003) ("Under [Rule 4(k)(2)], a defendant sued under federal law may be subject to jurisdiction based on its contacts with the United States as a whole, when the defendant is not subject to personal jurisdiction in any state.")).  Rule 4(k)(2) thus extends its jurisdictional reach to defendants not reachable under state law, but for whom exercise of personal jurisdiction comports with the due process requirements of the Fifth Amendment.  *See* Fed. R. Civ. P. 4 Advisory Committee's Notes, Subdivision (k), 1993 Amendments (constitutional restrictions on Rule 4(k)(2) "arise from the

In assessing a defendant's minimum contacts, a court evaluates the "quality and nature" of the defendant's contacts. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). The Court considers these contacts in totality, with the crucial question being whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" "such that [the defendant] should reasonably anticipate being haled into court there." *Id.* (quoting *Burger King*, 471 U.S. at 474–75). The inquiry "focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). The defendant's conduct in the lawsuit must create a "substantial connection" with the forum. *Id.* In evaluating this connection, the Court considers the contacts that the "defendant *himself* creates with the forum," not the plaintiff's connections to the forum. *Id.* at 1122 (emphasis in original) (citing *Burger King*, 471 U.S. at 475). Because the minimum contacts inquiry focuses on the defendant's contacts with the forum, not just the defendant's contacts with persons who reside there, "the plaintiff cannot be the only link between the defendant and the forum." *Id.* These due process limits on personal jurisdiction "principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties." *Id.* (citing

---

Fifth Amendment rather than from the Fourteenth Amendment, which limits state-court reach. . . . The Fifth Amendment requires that any defendant have affiliating contacts with the United States sufficient to justify the exercise of personal jurisdiction over that party."); *see also Dardana*, 317 F.3d at 207 ("Rule 4(k)(2) confers personal jurisdiction over a defendant so long as the exercise of jurisdiction comports with the Due Process Clause of the Fifth Amendment."); *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998) (while due process inquiry as to personal jurisdiction is similar under Fifth and Fourteenth Amendments, "[t]he principal difference is that under the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered.").

*Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92 (1980)).  They require, overall, "that a defendant be haled into a court in a forum . . . based on his own affiliation with the [forum], not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the [forum]."  *Id.* at 1123 (quoting *Burger King*, 471 U.S. at 475).[6]

When a plaintiff demonstrates the required minimum contacts between the defendant and the forum, the Court then assesses the reasonableness of exercising personal jurisdiction over the defendant, *i.e.*, whether the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice."  *Metro. Life Ins. Co.*, 84 F.3d at 568 (citation omitted); *see also Burger King*, 471 U.S. at 476 ("Once it has been that a defendant purposefully established minimum contacts within the forum" the Court may consider the contacts in light of the reasonableness factors); *cf. Walden*, 134 S. Ct. at 1126 (holding personal jurisdiction lacking because of lack of minimum contacts without undertaking reasonableness inquiry).  To do so, the Court applies the five-factor test of *Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano Cty.*, 480 U.S. 102, 113 (1987).  *Id.*  These factors are "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's

---

[6] The nature of the minimum contacts inquiry turns on whether the plaintiff pursues a theory of general jurisdiction or specific personal jurisdiction.  *Porina*, 521 F.3d at 127–28.  A court may have general jurisdiction over a non-resident defendant based upon a defendant's "continuous and systematic general business contacts" to the forum state; in such circumstances, a court may exercise personal jurisdiction over a defendant in a suit unrelated to the defendant's contacts with the state.  *Metro Life Ins.*, 84 F.3d at 567–68 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)).  A court may have specific personal jurisdiction based on the defendant's contacts with the forum related to the particular lawsuit.  *Porina*, 521 F.3d at 128 (citing *Helicopteros*, 466 U.S. at 414 n.8).  General personal jurisdiction requires a "more stringent minimum contacts test."  *Id.*  As discussed below, AmTrust solely pursues a theory of specific personal jurisdiction here.

interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Id.* (citing *Asahi*, 480 U.S. at 113–14). When a court reaches the reasonableness inquiry, the Court assesses the minimum contacts and the reasonableness inquiry in tandem, such that a lesser showing as to one may be tolerated if the other strongly favors an exercise of jurisdiction, and vice-versa. *Id.* (citing *Burger King*, 471 U.S. at 477) (while exercise of personal jurisdiction is favored when plaintiff has made a threshold showing of minimum contacts, it may be defeated if defendant makes "a compelling case that the presence of some other considerations would render jurisdiction unreasonable.").

### C.   Discussion

Lacchini's motion for dismissal for lack of personal jurisdiction ultimately turns on whether the Court has personal jurisdiction over him under Federal Rule of Civil Procedure 4(k)(2).  Although not renouncing the argument that personal jurisdiction exists under the New York long-arm statute, N.Y. CPLR § 302, AmTrust did not seriously pursue that theory in its briefs or at argument.  And, as the ensuing analysis reflects, § 302's requirements clearly are not met as to Lacchini.  Nor does, or could, AmTrust claim that the RICO statute provides a basis for personal jurisdiction.[7]  Accordingly, AmTrust's assertion of personal jurisdiction over Lacchini rises or falls on Rule 4(k)(2), which in turn requires that exercising of jurisdiction over Lacchini in this case arising under federal law be "consistent with the United States Constitution."  Fed. R.

---

[7] RICO does not have a jurisdictional provision authorizing personal jurisdiction—via authorized service of process—over foreign defendants.  *See PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 71–72 (2d Cir. 1998) (18 U.S.C. § 1965 "does not provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the defendant is found"); *see also* 18 U.S.C. § 1965(b) (permitting, when "ends of justice require," service of process upon "other parties residing *in any other district*" (emphasis added)); *Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 342–43 (S.D.N.Y. 2015) (18 U.S.C. § 1965 may not be used to exert personal jurisdiction over foreign defendants).

Civ. P. 4(k)(2).  AmTrust argues that Lacchini has sufficient contacts with the United States such that exercising jurisdiction comports with due process, AmTrust Opp. at 2, 10–16; Lacchini argues the contrary, Lacchini Rep. at 2–6.   The Court addresses the application of Rule 4(k)(2) after first explaining why personal jurisdiction is not sustainable under N.Y. CPLR § 302.

### 1.        The New York Long-Arm Statute, N.Y. CPLR § 302

New York's long-arm statute permits personal jurisdiction over non-New York domiciliaries based upon four distinct circumstances.

A court may exercise personal jurisdiction over a non-domiciliary who, "in person or through an agent:" (1) "transacts any business within the state or contracts anywhere to supply goods or services in the state;" (2) "commits a tortious act within the state[;]" (3) "commits a tortious act without the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial review from interstate or international commerce;" or (4) "owns, uses or possesses any real property situated within the state."  N.Y. CPLR § 302(a).

The second and fourth of these prongs clearly do not apply.[8]  The Court's discussion therefore focuses on the remaining two.

---

[8] CPLR § 302(a)(2) requires that a defendant have been physically present in New York when the tort was committed.  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 789–90 (2d Cir. 1999).  AmTrust does not so allege here; and Lacchini attests that he has never visited the United States, Lacchini Declaration ¶ 16.  CPLR § 302(a)(4) requires ownership, use, or possession of real property in New York.  AmTrust does not so allege, and Lacchini attests that he has never owned, used, or possessed real property in the United States.  *Id.* ¶¶ 7, 16.

### a.   CPLR § 302(a)(1)—Transaction of Business

Courts applying CPLR § 302(a)(1), the "transaction of business" provision, look at the totality of the circumstances of the party's interactions and activities within New York to determine whether the nonresident party has "purposely availed [himself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws." *Bank Brussels Lambert*, 171 F.3d at 787 (citation omitted).  To satisfy § 302(a)(1), a party need not be physically present in the state, and a single act may suffice, provided the claim against the defendant arises from that act.  *Id.*  Among relevant factors under § 302(a)(1) are, for example, whether an out-of-state defendant transacts business in New York, whether the defendant has an ongoing contractual relationship with a New York corporation; and in cases involving a contract, whether it was negotiated or executed in New York and what, if any, choice of law provision it contains.  *See Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 22–23 (2d Cir. 2004).

The facts as to Lacchini do not support personal jurisdiction under § 302(a)(1).  Although AmTrust's arbitral contract was negotiated in New York (and London), Complaint ¶¶ 18–20, Lacchini was not party to it—it was negotiated by Somma.  Lacchini had no involvement in any relevant events until he became chair of the arbitral panels in 2015, and the arbitrations were held in Milan and applied Italian law, Framework Agreement ¶ 6; Agency Agreement Art. 14. Lacchini's sole connection to New York during the arbitration was, in his capacity as arbitral chair, to send or cause his secretary to send emails to party AmTrust relating to the arbitrations. These emails, incident to his role as an arbitrator in Italy, did not solicit or do business in New York.  They do not reflect purposeful availment of the "privilege of conducting activities within

New York" by Lacchini or an invocation by him of "the benefits and protections of its laws."

*See Bank Brussels Lambert*, 171 F.3d at 787.

> **b.      CPLR § 302(a)(3)—Commission of a Tort Outside New York with Injury Inside New York**

The first prong of CPLR § 302(a)(3) inquires whether the defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered" in New York.  CPLR § 302(a)(3)(i). There are no allegations that Lacchini did so.

To establish the second prong, CPLR § 302(a)(3)(ii), the plaintiff must demonstrate that "(1) the defendant's tortious act was committed outside New York, (2) the cause of action arose from that act, (3) the tortious act caused an injury to a person or property in New York, (4) the defendant expected or should reasonably have expected that his or her action would have consequences in New York, and (5) the defendant derives substantial review from interstate or international commerce."  *Penguin Group (USA) Inc. v. American Buddha*, 609 F.3d 30, 35 (2d Cir. 2010) (citation omitted).  The substantial interstate or international commerce element of this test "narrows the long-arm reach to preclude the exercise of jurisdiction over nondomiciliaries who might cause direct, foreseeable injury within the State but whose business operations are of a local character."  *Ingraham v. Carroll*, 687 N.E.2d 1293, 1296 (N.Y. 1997) (quotation omitted).  The "bigness requirement" of this element is "designed to assure that the defendant is economically big enough to defend suit in New York."  *Id.* (quotation omitted).

Section 302(a)(3)(ii) does not confer jurisdiction over Lacchini, because, among other things, the Complaint is devoid of allegations that he "derives substantial revenue from interstate or international commerce," and Lacchini attests that he does not, Lacchini Declaration ¶ 11. Although AmTrust alleges Lacchini "invoiced AmTrust and/or ATEL more than $471,000 for

his services in the Arbitrations, and his invoices had been fully paid," Complaint ¶ 96, it does not

allege that those funds were paid from abroad or in international commerce.  Moreover, the

arbitral proceedings in which Lacchini participated were of a local character, in that they were

sited wholly in Italy and applied Italian law.  Framework Agreement ¶ 6; Agency Agreement

Art. 14.

### 2.      Due Process/Minimum Contacts

As to the constitutional due process inquiry, the threshold showing that AmTrust must

make is that Lacchini had minimum contacts with the United States.  The Complaint's

allegations to this effect are sparse:  They consist of the claim that Lacchini generally harmed

AmTrust by participating in a corrupt scheme with Somma that had harmful effects on arbitral

party AmTrust, Complaint ¶¶ 1, 3–4, 6, 111, 120, 126, which has its principal place of business

in New York and is incorporated in Delaware, *id.* ¶ 8.[9]  ATEL, the AmTrust subsidiary in the

TRI arbitration, is based in London and has a branch office in Italy.  *Id.* ¶ 14, 20.

In its brief opposing dismissal, AmTrust adds the allegation that, as arbitrator, Lacchini

sent or caused to be sent emails "via wires to AmTrust in New York," AmTrust Opp. at 13.  But

the Complaint does not quite allege this.  It identifies some 13 emails that "Somma and Lacchini

sent or caused to be sent" to AmTrust containing "procedural order[s]" and an order about "fees

and costs" relating to the TRG and TRI arbitrations during 2015 and 2016, *see* Complaint

¶¶ 108–09, but it does not say that the recipient of these emails was situated in New York (or

elsewhere in the United States).  Indeed, the Complaint nowhere identifies the AmTrust

---

[9] As noted, AmTrust does not allege, and Lacchini refutes, that he has sufficiently continuous business ties to the forum for the Court to exercise general personal jurisdiction over him.  The inquiry here thus focuses on whether the contacts between Lacchini and the United States in connection with this instant controversy permit the exercise of specific personal jurisdiction over Lacchini.

representative to whom these emails were sent, alleges that this person was a United States resident, or gives reason to infer that AmTrust's representation in an Italian-law arbitration in Milan was from the United States.[10]

Even assuming the Complaint had squarely alleged that Lacchini sent these emails to a United States recipient, the facts pled would fall far short of establishing the requisite minimum contacts with the United States.  When the conduct at issue occurs entirely outside of the forum, and the only relevant jurisdictional contacts are in-forum effects harmful to the plaintiff, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum."  *Licci*, 732 F.3d at 173 (citing *Calder*, 465 U.S. at 789).  But "the fact that harm in the forum is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant."  *In re Terrorist Attacks*, 714 F.3d at 674. Instead, "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."  *Walden*, 134 S. Ct. at 1125.  That is because "mere injury to a forum resident is not a sufficient connection to the forum. . . .  [A]n injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State."  *Id.*  Put differently, a defendant's actions in one forum do not create sufficient contacts with another forum merely because the

---

[10] Lacchini acknowledges that he sent one email in March 2016 from his professional email address to the arbitration panels and the parties and their counsel noting that the proceedings had been suspended.  Lacchini Declaration ¶ 20.  He also notes that email, along with the emails sent by the arbitral panels' secretary, was sent to the parties' counsel, which included AmTrust's counsel, the law firm Quinn Emmanuel Urquhart & Sullivan, LLP.  *Id.* ¶¶ 19–20.  He does not state, however, and AmTrust does not allege, that these emails were received in the United States.  And ATEL, the AmTrust party in the TRI arbitration, is based in London, with a branch office in Italy.  *Id.* ¶ 14, 20.

defendant "allegedly directed his conduct at plaintiffs whom he knew had . . . connections" to the other forum.  *Id.*

Here, AmTrust's allegations fail to support that Lacchini expressly directed his conduct at the United States, even if the financial effect of an adverse arbitral outcome might foreseeably have been felt by AmTrust in this country.  The claims against Lacchini describe conduct occurring in and quintessentially directed at events in Italy.  Lacchini is said to have joined with Somma to corrupt two arbitrations in Milan that applied Italian law to facts relating to the Italian medical malpractice insurance market.  Complaint ¶¶ 25–27.  Beyond alleging that AmTrust itself was an American concern, the Complaint simply does not allege that Lacchini schemed to cause effects in the United States or in a United States market.  That AmTrust is an American concern does not rescue AmTrust's claim because, as the Supreme Court has held, "the plaintiff cannot be the only link between the defendant and the forum."  *Walden*, 134 S. Ct. at 1122.

Nor would sending a small number of emails containing "procedural orders" to a person in the United States fill the void.  There are no factual allegations that these orders advanced the allegedly wrongful scheme beyond simply facilitating the arbitrations, let alone were acts of "purposeful availment of the privilege of carrying on [his] activities" in the United States, *Licci*, 732 F.3d at 173 (quotation marks omitted)); *see also TAGC Management, LLC v. Lehman*, No. 10 Civ. 6563 (RJH), 2011 WL 3796350, at *6–7 (S.D.N.Y. Aug. 24, 2011) (communications—a letter and an email—to plaintiffs in the United States were insufficient minimum contacts to confer personal jurisdiction) (collecting cases).

The cases on which AmTrust relies are easily distinguished.  In each, the court found that the conduct at issue was aimed at causing effects in the United States.  *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 13 Md. 2481 (KBF), 2015 WL 6472656, at *12 (S.D.N.Y. Oct. 23,

2015) (minimum contacts satisfied when defendants' allegedly unlawful antitrust scheme "contemplated that significant effects would occur in the aluminum market in the United States" by restricting the ability of certain aluminum warehouses in Detroit to ship aluminum); *United States v. Int'l Bhd. of Teamsters*, 945 F. Supp. 609, 621–23 (S.D.N.Y. 1996) (minimum contacts satisfied when a Canadian brewery refused, in violation of consent decree, to permit a Teamsters candidate from campaigning on a brewery parking lot in Canada, as refusal would impact union elections and endanger decree's goal of ridding Teamsters of influence of organized crime).

Because AmTrust fails to allege that Lacchini expressly directed his conduct at the United States so as to cause effects in the United States, Lacchini does not possess minimum contacts with the United States sufficient for the Court to exercise personal jurisdiction. The Court thus has no occasion to reach the second element of the due process inquiry: whether exercising personal jurisdiction over Lacchini would be unreasonable so as to offend notions of "fair play and substantial justice."

## CONCLUSION

For the foregoing reasons, the Court grants Lacchini's motion to dismiss for want of personal jurisdiction. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 14, and to close this case.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: February 23, 2017
       New York, New York